# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

Gary Allen Kachina,                                     Civil No. 06-cv-3661 (ADM/JJG)

        Petitioner,

                                      **REPORT AND RECOMMENDATION**

v.

State of Minnesota, and Joan Fabian,
Commissioner of Corrections,

        Respondents.

_____

      This matter is before the Court on Petitioner Gary Allen Kachina's ("Kachina") pro se application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  For the reasons set forth below, the Court recommends denial of Kachina's application and dismissal of this matter with prejudice.

## I.     BACKGROUND

      Kachina is a Minnesota state prisoner incarcerated at the Minnesota Correctional Facility in Lino Lakes ("MCF-LL").[1]  Kachina entered the Minnesota Department of Corrections' custody in October 2004, after a Hennepin County jury convicted him of two counts of first degree burglary.[2]

      Kachina's imprisonment arises out of events that occurred on May 10, 2004.  In the early hours of that morning, two Brooklyn Park, Minnesota homes were burglarized.

_____

[1] Kachina filed a change of address notice with the Court on July 3, 2007, reflecting an address in Columbia Heights.  The court file in Kachina's pending 42 U.S.C. § 1983 action indicates that Kachina was released from prison on supervised release on June 28, 2007.  *Aff. of Kim Ebeling*, Ex. A (Civil No. 06-cv-5125 (ADM/JJG), Doc. No. 52).  He returned to prison at MCF-LL on December 6, 2007, for violating the conditions of that release.  *Id.*

[2] Kachina was sentenced to serve 53 months for the burglary convictions.

### A.      The First Burglary:  T.W.'s House

The first burglary occurred shortly before 5:00 a.m. at T.W.'s home.  T.W. had fallen asleep on his living room couch while watching T.V. and awoke to a rustling sound.  Trial Transcript ("Tr.") at 449-450.  He sat up and saw an intruder standing in the hallway, approximately five feet from him.  *Id.* at 450.  Although the T.V. and a light in the adjoining kitchen were on, the intruder's face was obscured by shadow.  *Id.* at 450, 470.  T.W. yelled at the intruder, who ran for the door.  The intruder unsuccessfully fumbled with the lock on T.W.'s screen door, and then dove through the screen door.  *Id.* at 452.  T.W. immediately called 911, a call the 911 operator recorded as occurring at 5:00 a.m.  *Id.* at 453; Tr. of 911 call, Doc. No. 13, end of Part II (unnumbered).  He described the intruder to the 911 operator as "a young kid uh wearing a I think a white sweatshirt with red lettering on it and a red baseball cap."  Tr. of 911 call.  T.W. also stated that, "I don't know I didn't get a look - good look at him," and that, "He was white I think."  *Id.*

### B.      The Second Burglary:  T.G.'s House

The second burglary occurred shortly before 5:26 a.m. approximately ten blocks away at T.G.'s home.  *Id.*  T.G. was asleep in her bedroom with the T.V. on.  *Id.* at 618.  She awoke and saw a man appear at the foot of her bed.  *Id.*  T.G. asked him who he was.  *Id.* at 620.  He did not respond, and left the house.  *Id.*  T.G. then called 911, a call the 911 operator recorded as occurring at 5:26 a.m.  *Id.*, Tr. of 911 call.  She told the operator that she saw the intruder "perfectly."  *Id.*  She described him as, "White male, um red hat, white and blue shirt and jeans.  No (inaudible), real skinny, low cut hair, thin face."  *Id.*

C.      **Apprehension of Kachina**

Following T.W.'s 911 call, Officer Halek, a K-9 officer from the Brooklyn Park Police Department, and his police dog, Nitro, went to T.W.'s house to help find the burglar.  Halek and Nitro tracked a scent west from T.W.'s backyard for approximately ten minutes, but eventually lost it.  *Id.* at 564.  As they were trying to reacquire the track, Halek received a report of a second burglary in progress a few blocks west of where they had lost the track.  *Id.*  The suspect in the second burglary reportedly matched the description of the one in the first burglary.  *Id.* at 565. Halek drove to the area of the second burglary.  En route, he heard over his radio that another officer had seen a man running in the area, and believed it was the suspect.  *Id*. at 567.

Halek parked his squad, and he and Nitro began tracking.  Nitro picked up a fresh scent and led Halek to Kachina, who was  lying down in the back yard of a residence, near a wooded area.  *Id.* at 729.  Halek observed that Kachina was of slender build and was wearing a blue and white shirt.  *Id.* at 571.  Kachina was not wearing a cap.  *Id.* at 588.  Kachina ran from the K-9 pair.  Halek instructed Nitro to apprehend Kachina, which he did by biting him.  *Id.* at 575. Kachina was then handcuffed.  *Id.*

Officer Sand of the Brooklyn Park Police Department searched Kachina, and found credit cards, a large amount of change, cash, cigarette lighters, and cigarette packs on his person.  *Id.* at 718.  One of the credit cards had T.W.'s name on it.  *Id.* at 502, 731.  Kachina was also carrying a Festival Foods gift card.  *Id.* at 502.  Officer Sand found a red cap that was either on the ground next to Kachina or "around where he was."  *Id.* at 729.

**D.    The Identifications**

**1.    T.W.**

Approximately five minutes after T.W. called 911, Officer Lehman from the Brooklyn Park Police Department arrived at T.W.'s house. He and T.W. surveyed T.W.'s house. T.W. saw that his Bose stereo was gone, his wallet had been rifled through, and money, credit cards, and a Festival gift card were missing. T.W. also noticed that a vase filled with change, a carton of cigarettes, and some cigarette lighters were missing. *Id.* at 457.

While they were surveying the house, Officer Lehman heard over his radio that another burglary had occurred in the area and, shortly thereafter, that a suspect had been apprehended. *Id.* at 494-495. Officer Lehman told T.W. that there had been another burglary in the area, and that the police had chased and apprehended a suspect in that burglary with a police dog. *Id.* at 474-476. He told T.W. that this person was also a suspect in the burglary of T.W.'s house. *Id.* at 476.

Lehman then drove T.W. to a location approximately six blocks away from T.W.'s house where there were numerous other police cars parked on the street and officers milling around. *Id.* at 459. The officers asked T.W. if he could identify a man, Kachina, who was standing near a squad and two uniformed officers. T.W. asked, "Does he have a cap?" *Id.* at 478. The officers indicated to Kachina that he should put a cap on, which he did. T.W. then positively identified him as the man who had been in his house earlier that morning. *Id.* at 460.

**2.    T.G.**

After the police apprehended Kachina, Brooklyn Park Police Officer Gregory Burstad went to T.G.'s home. He asked her if she could identify the intruder that had been there. He told her that they had caught a suspect, and that, "We got him." *Id.* at 707. He stated that the man

had committed another burglary before hers, and that he had been "active." *Id.* at 708.  He told

her that, "Our dog made a biscuit out of him." *Id.* at 708.  Additionally, T.G. testified that an

officer told her that a police dog had followed the man's scent from her back door. *Id.* at 627.

T.G. rode in a squad with the police to a location three to four blocks from her home.

They pulled over, and T.G. remained seated in the squad's back seat.  The police took Kachina

out of another squad and brought him over to the car where T.G. was seated.   He was

handcuffed. *Id.* at 647.  T.G. identified him as the man who had just burglarized her house,

stating, "That's most definitely him." *Id.* at 628-629.

### E.    Hennepin County Court Proceedings

Before trial, Kachina moved to suppress testimony regarding T.W.'s and T.G.'s

identifications on the day of the burglaries and to suppress any identifications of Kachina by

them at trial. *Id.* at 248 (Doc. No. 13, Part II).  The trial judge denied these motions. *Id.* at 252.

At the close of trial, Kachina moved for a mistrial or reconsideration of his identification motion

with respect to T.G.'s identification testimony.   This motion was also denied. *Id.* at 664-668.

Both T.W. and T.G. testified at trial.  T.W. did not identify Kachina at trial.  T.G. did

identify him. *Id.* at 628.

Kachina also moved for various relief for the prosecution's disclosure the day before trial

of police squad video tapes and radio communications made during Kachina's apprehension and

arrest.  Tr. at 113-117.  The trial judge denied this motion.  Tr. at 264-265; 369-370.

Kachina testified at trial.  Tr. at 777.  He stated that he awoke early on the morning of

May 10, 2004, and went in search of a convenience store to buy food before going to work. *Id.*

at 778.  He testified that he had moved into the area about one month before, and became lost as

he tried to find the convenience store. *Id.*  He further testified that as he was trying to find his

way home he found various items on the street, including the credit cards, change, and other items the police found on him. *Id.* at 780. He testified that he was not wearing a red cap. *Id.* at 787.

### F. State Appellate Court Proceedings

Kachina appealed to the Minnesota Court of appeals, which affirmed his conviction. *See State v. Kachina*, No. A05-208, 2006 WL 1320026 (Minn. Ct. App. May 16, 2006). Kachina then filed a petition for review in the Minnesota Supreme Court, which was denied on August 15, 2006. *Id.*, Doc. No. 13, Part VII, last page (unnumbered).[3]

## II. ANALYSIS

Kachina argues that his release from state imprisonment is required under 28 U.S.C. § 2254 for four reasons: 1) T.W.'s and T.G.'s identifications violated the Due Process Clause of the Fourteenth Amendment; 2) the prosecution failed to timely disclose evidence favorable to him; 3) he was entitled to separate trials on the two counts of burglary; and 4) the prosecution's closing argument constituted prosecutorial misconduct. *See Petitioner's Memorandum*, Doc. No. 16. As fully discussed below, the Court finds that the latter two grounds, severance and prosecutorial misconduct, were not exhausted in state court. The Court, therefore, recommends dismissal with prejudice of those portions of Kachina's petition. The identification and evidence disclosure grounds were exhausted in state court, and are, therefore, addressed on the merits.

### A. Exhaustion

A state prisoner can access federal habeas relief only after exhausting "the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). The purpose of the exhaustion

---

[3] The Minnesota Court of Appeals recently affirmed the denial of Kachina's post-conviction motion to correct his sentence. Kachina unsuccessfully challenged the Minnesota Department of Corrections' decision to assign him to intensive supervised release upon his supervised release. *See Kachina v. State*, No. A07-1400, 2008 WL 467440 (Minn. Ct. App. Feb. 12, 2008).

requirement is to provide the state court an "opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (internal quotations and citations omitted).[4]   The requirement is satisfied where the habeas petitioner has given the state's highest court "a fair opportunity to rule on the factual and theoretical substance of his claim." *Ashker v. Leapley*, 5 F.3d 1178, 1179 (8th Cir. 1993) (citing *Picard v. Connor*, 404 U.S. 270, 275-278 (1971)).   To do so, the petitioner must identify "a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue." *Cox v. Burger*, 398 F.3d 1025, 1031 (8th Cir. 2005) (quotation omitted).

### 1.   Identification of a Federal Claim

Respondents do not dispute that Kachina raised each of his four habeas issues in the trial court and at the Minnesota Court of Appeals.   They, however, argue that he failed to raise all but the improper identification issue at the Minnesota Supreme Court, warranting dismissal of his petition for failure to fully exhaust his state court remedies.

Respondents base their argument on the manner in which Kachina submitted his petition for review to the Minnesota Supreme Court.   Kachina was represented by counsel throughout the state court proceedings.   His lawyer submitted his Minnesota Supreme Court petition for review. The body of that petition included only the improper identification issue.   Doc. No. 13, Part VII (unnumbered).   Appended to Kachina's Minnesota Supreme Court petition, however, was a pro

---

[4] Section 2254 exhaustion doctrine has been further explained as rooted in comity considerations and "principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings." *Rose v. Lundy*, 455 U.S. 509, 519 (1982).

se supplemental brief he submitted in the Minnesota Court of Appeals.[5]  This brief identified the additional three issues Kachina urges the Court to consider here.  It also included citations to and discussion of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Kyles v. Whitley*, 514 U.S. 419 (1995), Supreme Court cases addressing the federal Due Process implications of disclosure of evidence favorable to the accused.  Respondents contend that simply attaching arguments to a petition for review does not provide the state court a "fair opportunity" to address them.

The Court finds that Kachina's discussion of the exculpatory evidence issue in his pro se brief appended to his Minnesota Supreme Court petition sufficiently alerted that court to a federal claim.  "Where a state supreme court allows incorporation of materials contained in the appendices to the petition for review, a petitioner may fairly present the federal nature of his claims if the federal nature of the claims appears in the appendices." *Thibodeau v. Carlson*, Civil No. 06-458 (JNE/SRN), 2007 WL 4372960, *3 (D. Minn. Dec. 6, 2007) (citing *Insyxiengmay v. Morgan*, 403 F.3d 657, 668-69 (9th Cir. 2005)).  Such is the case here.  Minn. R. Civ. App. P. 117 allowed Kachina to submit an appendix with his petition.  The brief contained in his appendix clearly identified the exculpatory evidence issue as a federal one by citation to federal caselaw.

The Supreme Court's *Baldwin* decision is also relevant.  In that case, a federal habeas petitioner failed to fairly present a federal claim in his petition for review to the Oregon Supreme Court.  541 U.S. at 30.  His federal claim, however, was clearly discussed in the lower Oregon state court decisions underlying the petition for review.  *Id.*  The petitioner argued that, since the Oregon Supreme Court had the opportunity to read those opinions, it was fairly alerted to the

---

[5] Minn. R. Civ. App. P. 117 allows a petitioner to submit an appendix with a Minnesota Supreme Court petition for review containing "any portion of the record necessary for an understanding of the petition."

federal claim, even though his habeas petition, itself, did not explicitly state it.  *Id.* at 30-31.  The Court rejected this argument, opining that state appellate judges cannot be required to read lower court opinions to ferret out federal claims.   541 U.S. at 31-32.   The Court stated, "We consequently hold that ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so."  *Id.* at 32.

*Baldwin* directs that, while state appellate courts cannot be required to review lower court opinions to identify federal claims, a statement of federal claims in a petitioner's brief is sufficient to raise federal claims.   Here, unlike in *Baldwin*, Kachina appended a brief to his petition, sufficiently alerting the Minnesota Supreme Court to the exculpatory evidence claim.  Thus, Kachina exhausted this claim.

The remaining two issues Kachina raises in his habeas petition, severance and prosecutorial misconduct, were also raised in his pro se submission attached to his Minnesota Supreme Court petition.   Kachina, however, failed to identify a federal constitutional claim regarding them.   With regard to the severance claim, Kachina argued that the trial court's decision not to sever the two burglary charges violated Minn. R. Crim. P. 17.03, citing two state cases arising under that rule.[6]  Nothing in his argument or the authority he cited provided even a glimmer of a federal constitutional issue.

Similarly, with respect to the prosecutorial misconduct argument, Kachina described the various parts of the prosecutor's closing argument that he contends were unfair or prejudicial, but failed to cite a federal constitutional provision implicated by this conduct or any federal or state

---

[6] Kachina cited *State v. Profit*, 591 N.W.2d 451 (Minn. 1999), and *State v. Jackson*, 615 N.W.2d 391 (Minn. Ct. App. 2000).

case identifying a constitutional issue.  No federal constitutional claim, therefore, was presented to the Minnesota Supreme Court with respect to either the severance or prosecutorial misconduct claims.  *See Carney v. Fabian*, 487 F.3d 1094, 1097 (8th Cir. 2007).  Accordingly, Kachina failed to exhaust state remedies with regard to those claims.

In sum, Kachina clearly alerted the Minnesota Supreme Court to his due process identification claim in the body of his petition for review.  This claim was, therefore, exhausted.  His exculpatory evidence claim was also exhausted, because he raised it in his pro se brief appended to his Minnesota Supreme Court petition and identified the federal constitutional basis for it.  Kachina did not, however, alert the Minnesota Supreme Court to any federal constitutional bases for his severance and prosecutorial misconduct claims.  Those claims are, therefore, unexhausted.

### 2.   Mixed Petition

Kachina's habeas petition is, therefore, mixed, containing two exhausted and two unexhausted claims.  In *Rose v. Lundy*, the Supreme Court held that mixed habeas petitions containing exhausted and unexhausted claims must generally be dismissed to allow the petitioner to fully exhaust state court remedies.    455 U.S. 509, 522 (1982).  However, where further pursuit of unexhausted claims in state court is unavailable, the claims are deemed to be exhausted for purposes of habeas review.   *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Armstrong v. State*, 418 F.3d 924, 926 (8th Cir. 2005).[7]  Under such circumstances, federal habeas review of the unexhausted claims is precluded unless the petitioner can demonstrate

---

[7] *See also* 28 U.S.C. 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the court of the State.").   In this circuit, issues of procedural bar are ordinarily resolved before reaching a claim's merits, unless judicial economy dictates addressing the merits first.  *See Barrett v. Acevedo*, 169 F.3d 1155, 1162 (8th Cir. 1999).

cause and prejudice to excuse his procedural default, or actual innocence. *Id.* Absent such a showing, dismissal of the unexhausted and defaulted claims with prejudice is the proper course. *Id.*

Here, any attempt by Kachina to exhaust the severance and prosecutorial misconduct claims in state court would be futile. Since he did not properly raise any federal basis for those claims on direct appeal, he can no longer do so. *McCall v. Benson*, 114 F.3d 754, 757 (8th Cir. 1997) (citing *State v. Knaffla*, 243 N.W.2d 737, 741 (Minn. 1976)). Furthermore, no argument has been made, and the Court finds no evidence that, these claims were unknown to Kachina at the time of his direct appeal, that such claims were so novel that their basis was not reasonably available, or that fairness requires deviation from *Knaffla*'s general rule. *See Roby v. State*, 531 N.W.2d 482, 484 (Minn. 1995).

Federal habeas review of these defaulted claims, therefore, is barred unless Kachina can demonstrate cause and prejudice, or his actual innocence. He has not done so.

The Court, therefore, recommends that Kachina's unexhausted claims (severance and prosecutorial misconduct) be dismissed with prejudice as procedurally barred. *See Armstrong*, 418 F.3d at 926. *See also Knox v. Feneis*, Civil No. 05-908 (MJD/JSM), 2006 WL 2827248 (D. Minn. Sep. 29, 2006) (dismissing procedurally defaulted claims with prejudice and considering merits of exhausted claim).

### B.    Merits of Exhausted Claims

The Court next considers the merits of Kachina's remaining claims, specifically his Fourteenth Amendment Due Process arguments regarding improper identifications and exculpatory evidence.

### 1.    Legal Standard

A federal court's review of the state court decisions underlying a state prisoner's petition for writ of habeas corpus is "limited and deferential."  *Collier v. Norris*, 485 F.3d 415, 421 (8th Cir. 2007) (citation omitted).  The Anti-Terrorism and Effective Death Penalty Act of 1996 sets forth three circumstances where it is appropriate for a federal court to grant a state prisoner's habeas petition:  1) the state court adjudication was contrary to clearly established federal law; 2) the state court adjudication involved an unreasonable application of clearly established federal law; or 3) the state court adjudication was based on an unreasonable determination of the facts.  28 U.S.C. § 2254(d).[8]

Under circumstance number one, a state court decision is contrary to clearly established federal law if it contains a legal conclusion opposite to that reached by the Supreme Court or if it construes facts "materially indistinguishable" from those found in Supreme Court precedent to arrive at an opposite result from that precedent.  *Davis v. Norris*, 423 F.3d 868, 874 (8th Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).

Circumstance number two, the state court's unreasonable application of clearly established federal law, is similar to circumstance one.  This situation is triggered where the state court correctly identifies the governing Supreme Court precedent, but unreasonably applies it.  *Davis*, 423 F.3d at 874.  To warrant habeas relief, the state court's misapplication of the federal law must have been "objectively unreasonable."  *Collier*, 485 F.3d at 421 (citations omitted).

---

[8] The Act states, "An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-- (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

Circumstance number three, the state court's unreasonable determination of the facts, is subject to the Act's mandate that, "[A] determination of a factual issue made by a State court shall be presumed to be correct.   The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

### 2.       Identifications

Kachina contends that the trial court's admission of testimony regarding T.W.'s and T.G.'s out-of-court identifications and T.G.'s in-court identification violated his Fourteenth Amendment Due Process rights.  He argues that the Brooklyn Park Police Department's show-up procedures were impermissibly suggestive and produced unreliable identifications.  Kachina emphasizes that, not only were one-person show-ups used, police officer comments to both witnesses conveyed that Kachina had committed the burglaries.  Additionally, T.W. identified Kachina only after the police told Kachina to put on a cap.

The overarching concern when considering the admissibility of identification testimony is the reliability of the identification.  *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).[9]  A two part test applies to assess reliability in this context:  1) whether the identification technique was impermissibly suggestive; and 2) if so, whether, under the totality of the circumstances, the suggestive confrontation created a "substantial likelihood of irreparable misidentification."  *Id.* at 107.  *See also Manning v. Bowersox*, 310 F.3d 571, 577 (8th Cir. 2002).  The following five factors guide the totality of the circumstances analysis:  1)  the opportunity of the witness to view the criminal at the time of the crime; 2) the witness' degree of attention; 3) the accuracy of the

---

[9] The same analysis generally applies to the admissibility of the show-up and in-court identifications.  *See Neil v. Bigger*s, 409 U.S. 188, 381-382 (1972); *U.S. v. Patterson*, 20 F.3d 801, 805 (8th Cir. 1994).

witness' prior description of the criminal; 4) the witness' level of certainty at the confrontation; and 5) the time between the crime and the confrontation.  *Manson*, 432 U.S. at 114.

###### a.    T.W.

The trial court opined that the identification procedure used with respect to T.W.'s identification was likely not impermissibly suggestive.  It compared the police officer comments to T.W. and T.G. prior to their respective identifications, reasoning that the police essentially told T.G. that they thought Kachina was the man who burglarized her house before asking her to identify him.  Tr. at 249.  It contrasted that situation with police comments to T.W. before his identification of Kachina, which included that the police had caught a suspect, but fell short of telling T.W. that they believed the suspect had burglarized his house.  *Id.*

Despite its view of the differences in the police comments to the two witnesses, the trial court conducted a totality of the circumstances analysis of the reliability of T.W.'s identification. *Id.*  It expressly considered each of the five totality of the circumstances factors identified in *Manson*.  *Id.* at 249-252.  It ultimately concluded that the T.W.'s identification passed muster under the totality of the circumstances.  *Id.*  It emphasized that: 1) T.W. had a good opportunity to view the intruder as he struggled for at least 45 seconds to open the door to T.W.'s home; 2) T.W.'s undivided attention was on the intruder; 3) the time period between the crime and T.W.'s identification was short, roughly 30 minutes; and 4) T.W.'s level of certainty after Kachina put on the hat was high.  *Id.*

The Minnesota Court of Appeals agreed.  It concluded that while the show-up procedure used with T.W. was unnecessarily suggestive, the totality of the circumstances did not render T.W.'s identification unreliable.  2006 WL 1320026 at *4.

Thus, both state courts correctly identified the proper two-part test under federal law, including the five factors contributing to the totality of the circumstances reliability analysis. The state courts reasoned through the application of the five factors, both concluding that that overall circumstances of T.W.'s identification rendered it sufficiently reliable.

T.W.'s identification of Kachina is not without its problems.  Aside from the police comments to T.W. prior to the show-up, T.W. told the 911 operator that he did not get a good look at the burglar.  He testified that the burglar's face was obscured by shadow.  At the show-up, T.W. asked the police if Kachina had a cap.  Only after the police instructed Kachina to wear the cap did T.W. positively identify him.  The record is not particularly clear regarding the source of the cap and whether it was even Kachina's.[10]  The Court notes, therefore, that T.W.'s opportunity to view the suspect may not have been good and that his level of certainty regarding his identification, at least before Kachina put on the cap, may not have been strong.

It is not, however, enough for this Court to find inconsistencies in the state courts' analyses, or even to conclude that it would have applied federal law differently.  *Collier*, 485 F.3d at 421.   Rather, the state court conclusions must be contrary to clearly established federal law or an objectively unreasonable application thereof.  Such is not the case here.  The state courts properly identified the applicable federal law, and their totality of the circumstances analyses, while perhaps arguable, were not objectively unreasonable.  *See Clark v. Caspari*, 274 F.3d 507, 511-512 (8th Cir. 2001) (affirming district court denial of habeas relief where show-up procedure suggestive, but identification nonetheless reliable under totality of circumstances). *See also Trevino v. Dahm*, 2 F.3d 829, 833 (8th Cir. 1993) (denying habeas relief and holding

---

[10] Officer Halek, who, along with Nitro, apprehended Kachina, testified that Kachina was not wearing a cap at the time he caught him.  Tr. at 588.   Officer Sand, who searched Kachina once he was apprehended testified that he found a red cap "either next to him or around where he was…. Probably be [sic] more next to him."  Tr. at 729.

that state court's evaluation of indicia of reliability is a factual determination afforded great deference on habeas review).

The Court next considers whether the state courts made unreasonable factual determinations warranting habeas relief.  A state court's factual determinations are presumptively correct and can be rebutted only with clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  A state court's totality of the circumstances reliability analysis is such a factual determination afforded great deference by this Court.  *Id.*; *Trevino*, 2 F.3d at 833.

The Minnesota Court of Appeals made an erroneous factual statement in its analysis of T.W.'s identification testimony.  It stated,  "Unlike the eyewitness in [*State v.*] *Anderson*, T.W. positively identified appellant at trial as the intruder."  2006 WL 1320026 at *4.  This statement was incorrect.  T.G., not T.W., positively identified Kachina at trial.  T.W. testified at trial, but did not identify Kachina.  Respondents concede the error.  Thus, the presumption of correctness typically afforded state court factual determinations has been rebutted with respect to the Court of Appeals' conclusion that T.W. identified Kachina at trial.  *Collier*, 485 F.3d at 423.

While the appellate court made a faulty factual determination, "it does not necessarily follow that the state court adjudication was based on an unreasonable determination of the facts because subsection (d)(2) [of 28 U.S.C. § 2254] instructs federal courts to evaluate the reasonableness of the state court decision 'in light of the evidence presented in the State court proceeding.'"  *Collier*, 485 F.3d at 423 (quoting 28 U.S.C. § 2254).  In *Collier*, the court considered whether two factual errors made by a state appellate court justified habeas relief.  It concluded that they did not because additional evidence in the record supported the state court's determination.  *Id.* at 423.

Similarly, here, the state appellate court's erroneous statement that T.W. identified Kachina at trial was not a significant basis for its conclusion that T.W.'s show-up identification was reliable.  2006 WL 1320026 at *4.  Rather, the appellate court emphasized that the trial court carefully weighed the totality of the circumstances evidence in reaching its conclusion to admit T.W.'s identification testimony.  The appellate court also noted additional facts supporting the trial court's conclusion.  2006 WL 1320026 at *4.  As in *Collier*, therefore, viewing the record in its totality, the state appellate court's factual error does not warrant habeas relief.

     **b.**    **T.G.**

The prosecution conceded at trial that the out-of-court show up procedure used with witness T.G.'s identification was impermissibly suggestive.  Tr. at 249.  The state courts' analyses with respect to that identification were, therefore, focused on whether the totality of the circumstances rendered the identification reliable.  *Id.*; 2006 WL 1320026 at *4.

In making the totality of the circumstances determination, both state courts properly considered the five *Manson* factors.  They noted that T.G.'s opportunity to view was very good, as she was only five feet from the burglar when he appeared in her bedroom.  They also noted that her attention was undivided, her description accurate, her level of certainty high, and the short time between the crime and the confrontation.  Thus, while it was undisputed that the show-up identification procedure was highly suggestive, both courts concluded that the overall circumstances of T.G.'s encounter with the burglar rendered her out-of-court identification reliable.  For the same reasons, the trial court concluded that T.G.'s in-court identification was also reliable.  Tr. at 666-667.[11]

---

[11] The Minnesota Court of Appeals did not explicitly address the reliability of T.G.'s in-court identification, as it appears to have mistakenly understood that T.W., rather than T.G., made an in-court identification.

The Court finds the state court conclusions to be consistent with clearly established federal law.  As with T.W.'s identification, the state courts correctly identified the applicable federal precedent and analyzed the overall reliability of the identification using the proper factors.  The Court does not find their analyses contrary to clearly established federal law or objectively unreasonable.  Nor does the Court find, or does Kachina identify, any unreasonable factual determinations with respect to T.G.'s identifications.  *See Clark*, 274 F.3d at 511-512; *Trevino,* 2 F.3d at 833.

### 3.    Exculpatory Evidence

Kachina argues that the State failed to timely disclose exculpatory evidence consisting of police squad videotapes showing the identification procedures used prior to Kachina's arrest, and police radio tapes containing communications occurring during the search for and arrest of Kachina.[12]

The Brooklyn Park police disclosed the police squad videotapes and radio communication tapes to the prosecutor the day before Kachina's trial was to begin.  The prosecutor disclosed them immediately to Kachina's lawyer.  Kachina moved the trial court to dismiss the charges against him, preclude the use of the new evidence, preclude the witness identifications of Kachina, preclude the testimony of police officers submitting the late evidence, or continue the trial.  Tr. at 113-117 (Part II).  Kachina argues that the evidence was exculpatory and should have been disclosed earlier pursuant to *Brady* and *Kyles*.  He contends that the late disclosure prejudiced his lawyer's ability to prepare his defense.

---

[12] Kachina also argues that the videotapes the State produced contained blank portions, and suggests that intentional destruction of evidence may have been involved.  The trial court found no evidence, or even an allegation, of this. Tr. at 370.  The Court of Appeals agreed.  2006 WL 1320026 at *5.  This Court finds no Section 2254 error in the state courts' analyses of this issue.

The state courts' determinations were consistent with federal law.  The state courts properly identified and applied the key factors relevant to the *Brady* analysis:  1) whether the prosecution suppressed evidence, 2) whether the evidence was material and favorable to the defendant; and 3) whether prejudice occurred.  *Collier,* 485 F.3d at 422.

The trial judge explicitly considered *Brady* and *Kyles,* and questioned their applicability in the first instance as the disputed evidence was disclosed before trial.  Tr. at 125-126.  Regardless, recognizing the potential materiality of the evidence, the trial judge gave counsel additional time to review it.  Tr. at 131.[13]   Under these circumstances, the trial judge concluded that the defense was not substantially prejudiced by the disclosure.

The Court of Appeals agreed, stating, "Because the evidence was disclosed prior to trial and the defense was afforded an opportunity to review the evidence prior to trial, we conclude the district court did not abuse its discretion in denying appellant's motion for other discovery sanctions."  2006 WL 1320026 at *5.

The state court determinations were consonant with federal law.  Under *Brady*, prejudice is shown "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different."  *Kyles*, 514 U.S. at 433.  Here, as both state courts noted, the evidence was, in fact, disclosed to the defense prior to trial, even if the disclosure was belated.  The trial judge gave counsel additional time to process it.  Under these circumstances, the state courts concluded that no prejudice to the outcome of the trial, which had

---

[13] The trial judge gave counsel approximately one day to review the additional evidence before they fully argued Kachina's motion regarding it. Tr. at 131 (Part II). The trial judge denied the motion after this additional time to review had passed and further argument was made.  Tr. at 264-265; 369-370 (Part III).  The trial was then further delayed due to the need to impanel a new jury, giving counsel several additional days to review the evidence.  *Id.* at 266 (Part III).

not even occurred, existed.  Tr. at 127.  This Court does not find this conclusion to be contrary to, or an unreasonable application of, federal law.[14]

Finally, Kachina does not argue that the state courts unreasonably applied the facts with respect to his *Brady* claim, and the Courts finds no such factual deficiency.

The Court, therefore, recommends dismissal of Kachina's *Brady* claim.

## III.   CONCLUSION

Kachina's petition for habeas relief is mixed, containing two exhausted and two unexhausted claims.  Because he failed to raise the unexhausted claims as part of his direct state court appeal from his burglary conviction, they are now procedurally defaulted.  The Court, therefore, recommends dismissal with prejudice of Kachina's two unexhausted claims.

Kachina's exhausted claims, Fourteenth Amendment due process arguments relating to witness identifications and disclosure of potentially exculpatory evidence, do not meet the requirements for habeas relief set forth in 28 U.S.C. § 2254(d).  The Court, therefore, also recommends dismissal of these claims on their merits.

## IV.   RECOMMENDATION

Being duly advised of all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT:**

    A.    Petitioner Gary Allen Kachina's application for habeas corpus relief under 28 U.S.C. § 2254 (Doc. No. 1) be DENIED;

    B.    This action be DISMISSED WITH PREJUDICE.

---

[14] While the Minnesota Court of Appeals appears to have considered the issue primarily under state law, rather than federal law, this does not prevent our review of the reasoning and substance of its decision.  *Jones v. Luebbers*, 359 F.3d 1005, 1012 (8th Cir.), *cert. denied*, 543 U.S. 1027 (2004).

Dated:  March 17, 2008.

         s/ *Jeanne J. Graham*
        JEANNE J. GRAHAM
        United States Magistrate Judge


**NOTICE**

Pursuant to Local Rule 72.2(b), any party may object to this report and recommendation by filing and serving specific, written objections by **April 1, 2008**.  A party may respond to the objections within ten days after service.  Any objections or responses filed under this rule shall not exceed 3,500 words.  The District Court shall make a de novo determination of those portions to which objection is made.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the United States Court of Appeals for the Eighth Circuit.  Unless the parties stipulate that the District Court is not required, under 28 U.S.C. § 636, to review a transcript of the hearing in order to resolve all objections made to this report and recommendation, the party making the objections shall timely order and cause to be filed within ten days a complete transcript of the hearing.